·Argued October 28, decided November 11, 1913.

# BAKER *v.* MORAN.

### (136 Pac. 30.)

**Gifts—Mortis Causa—Evidence.**

1. In an action where plaintiff claimed two bank drafts as a gift *causa mortis*, evidence *held* to show that deceased intended to make the gift in question.

**Gifts—Mortis Causa—What Constitutes—"Gift Causa Mortis."**

2. Where deceased, after being practically told that he could not recover, handed plaintiff, his best friend, two unindorsed drafts, telling him that whatever happened they were for him, there was a complete gift *causa mortis*, which is a gift of personalty made by a person in the expectation of imminent death but to take effect only in event of the donor's death without previous revocation; an actual delivery of possession being necessary to perfect such a gift, which differs from a gift *inter vivos* only in the possibility of revocation.

[As to gifts *causa mortis*, see note in 99 Am. St. Rep. 890. As to such gifts of notes and choses payable to order, see notes in 23 Am. Dec. 600; 25 Am. Dec. 389.]

**Bills and Notes—Gifts—Passage of Title—Indorsement.**

3. Upon a sale or gift, where a negotiable instrument is actually delivered, title passes without indorsement.

**Gifts—Causa Mortis.**

4. Where deceased delivered unto plaintiff two unindorsed drafts as a gift *causa mortis* and thereafter wrote a letter to the bank in which he kept deposits, referring more to the deposits than to the drafts, his retention of that letter until after his death will not defeat the gift.

**Gifts—Causa Mortis—Contents.**

5. While gifts *causa mortis* should be closely scrutinized with a view to preventing fraud, yet where the intention of donor is clear, mere formal objections should not be allowed to defeat it.

From Baker: GILBERT W. PHELPS, Judge.

En Banc. Statement by MR. CHIEF JUSTICE MC-BRIDE.

This is a suit by William Baker against O. E. Moran and O. E. Moran as administrator with the will annexed of the estate of Andrew A. Manser, deceased, and Nicholas Manser, Christopher Manser, Peter

Manser, Mary E. Rinkey and Mrs. John Kolbe, the practical effect of which is to determine the validity of an alleged gift *causa mortis,* made by one Andrew Manser to plaintiff, of two drafts for $2,000 each. The evidence tends to show that Manser was an unmarried man, a miner by occupation, and at the time of the alleged gift the owner of money and property of the value of from $13,000 to $15,000; that he was somewhat penurious in his habits and not on very kindly terms with his relatives. He became acquainted with plaintiff in Baker City in 1907. They were both members of the same lodge of Odd Fellows and became very intimate friends. In 1909 Baker had an attack of typhoid fever, which left him in somewhat impaired health, and in December of that year Manser became sick with tuberculosis. At his request Baker visited him and thereafter called on him frequently. They discussed the condition of their health and finally planned a trip to California. Manser, not wishing to be exposed to the damp climate of the Willamette Valley, went by way of Salt Lake, while Baker went by way of Portland, reaching San Diego, which was the agreed meeting place, about New Year's 1910. The time of Manser's arrival is not disclosed by the testimony, but Mr. McRae, who was Noble Grand of the Odd Fellows Lodge in that city, states that he found Manser at his room in the Willard Hotel on the 6th or 7th of February, who stated that soon after his arrival in San Diego he had been compelled to go to the hospital for about two weeks, and that thereafter he returned to the hotel, which indicated that he had probably arrived sometime between the 1st and 15th of January, 1910. Being asked by McRae if he wanted a nurse or needed help, he answered that there was a man down there by the name of Baker who was a very dear friend of his and requested McRae to

find him, as he wished him to come and take care of him. McRae had previously met Baker in the Odd Fellows Lodge and found him and accompanied him to Manser's room, and when Manser saw Baker he said: "Billy, for God's sake never leave me now until I am either croaked or get better." From that time on Baker remained with Manser, in attendance upon him, looking after his wants, until Manser's death, on the 19th day of February, 1910. At different times McRae wanted Manser to get another nurse to help Baker, but he always refused, saying that he did not want anyone except Baker. Manser was asked by McRae if he wanted the lodge there to pay the necessary wages and expenses for taking care of him and to send a bill to the lodge at Baker, as was usually done, and Manser said that he did not, that Baker would take care of him; and that he would see that Baker was well paid for doing so. Subsequent to this time, and on or about the 13th day of February, 1910, Manser suffered a very severe hemorrhage necessitating the calling in of a doctor, and he asked the doctor, after the doctor had made his examination, whether or not he had any chance to recover. The doctor told Manser that he would not be able to stand many more hemorrhages and that unless they were stopped he might pass away at any time. After the doctor left, Manser sat on the couch in the room with his head in his hands for several minutes and finally said to Baker, "That is an awful bad verdict." He thought a few minutes longer and then pulled out the two drafts in question, handed them over to Baker, and said: "Whatever we do—whatever may happen, they are for you to use for yourself. They are for you. I want you to have them to use for your own use. They are yours. I want you to have these anyway." He also told Baker he was to have whatever money there

remained on deposit to his credit in the bank at Dillon at his (Manser's) death. Baker then took the drafts, placed them in an envelope, and, putting them in his pocket, kept them in his possession and control until after he had been appointed as the executor of the will, when he went to Montana and exchanged the two drafts for certificates of deposit, which were turned over by him to the clerk upon the order of the county judge. At the time the drafts were given to Baker by Manser, Baker asked Manser if he did not want to indorse them. Manser replied: "It isn't necessary. I will write a letter and have it fixed so you are sure of getting the money. If anyone should steal them now without any indorsement they can't cash them." A letter was subsequently dictated by Manser and written by Claude Woolman to the Dillon State Bank at Dillon, Montana, as follows:

"San Diego, California, Feb. 14, 1910.
"Mr. A. L. Stone, Cashier Dillon State Bank, Dillon, Montana.

"Dear sir: This day I have made out and signed my last and only will, and have named one Mr. William Baker as executor without bonds. Recently I wrote you regarding a certain mortgage, and desire at this time to request you to call in the loan at once, or should you find it necessary, to bring action to recover. After my death I desire Mr. William Baker to, upon demand, withdraw any portion of the money credited to my account, and on deposit in the Dillon State Bank. Herewith you will find signature of Mr. William Baker, witnessed by myself and two residents of the city of San Diego, members of the I. O. O. F.

"Andrew A. Manser (Wm. Baker).
"Witness: Claude Woolman,
"Councilman San Diego, Cal."

Before writing this letter Manser had executed a will, by which he had made specific bequests to cer-

tain of his relatives of an amount about sufficient to cover the residue of his estate, exclusive of the drafts claimed by Baker. There was no residuary clause in the will. The will was probated in Baker County, and plaintiff was appointed as executor. Later he was removed, and defendant Moran was appointed in his stead. Baker brought this suit to compel Moran to deliver to him certain certificates of deposit which had been substituted for the drafts originally placed in his possession by Manser and obtained a decree, from which defendants appeal.          AFFIRMED.

For appellants there was a brief over the names of *Messrs. McColloch & McColloch* and *Messrs. Clifford & Correll,* with an oral argument by *Mr. Claude C. McColloch.*

For respondent there was a brief over the names of *Mr. John L. Rand, Mr. William H. Packwood, Jr.,* and *Mr. A. A. Smith,* with an oral argument by *Mr. Smith.*

Opinion by MR. CHIEF JUSTICE MCBRIDE.

1. At the outset it may be stated that it is clearly established that Manser intended that Baker should be his beneficiary to the extent of the drafts claimed by him. This fact is established by the testimony of the plaintiff and is corroborated by the testimony of McRae, who testifies that Baker showed him the drafts in Manser's presence and told him that Manser had given them to him, to which statement Manser made no objection. It is true that the witness would not say positively that Manser heard the conversation, but the evidence shows that it took place in the room in which Manser was lying and under circumstances that rendered it improbable that he failed to hear what was said. At all events, this testimony dispels any doubt which might be raised that Baker was acting

secretly or in an underhand manner in respect to the
alleged gift of the drafts. Had such been his inten-
tion, he would not have stated that Manser had given
him the drafts when Manser was in a position where
he was likely to hear the declaration and, if false,
deny it. The evidence also discloses such an intimacy
between the two men as renders such a disposition of
the property reasonable. There can be no doubt that
this friendship was remarkably close. Witnesses at
Baker City testify as to their close friendly relations
there; one witness saying that they were as intimate
with each other as men could be, not to be twin
brothers. They had planned the trip to California
for the mutual benefit of their health, and, when the
Noble Grand of the Odd Fellows Lodge suggested a
nurse, Manser stated that he had a very dear friend
named Baker, whom he desired to take care of him.
And later, when the same witness asked if the lodge
at San Diego should pay for nursing him in his sick-
ness and send the bill to Manser's lodge, he stated
that he would pay Baker fully himself. Again, in
conversing with this witness about his property, he
said: ''His relatives never treated him very good, and
he did not think they were entitled to very much of his
money, but he said that outsiders were kinder to him
than even his own relatives, and he said that he ought
to reward those that were good to him in his illness
rather than his relatives.'' This expression could
refer to no one but plaintiff, who had been more than
a brother to Manser, waiting upon him in his sickness,
answering every demand upon his strength, and min-
istering to his every want. As before remarked, the
intent of Manser to give Baker these drafts is beyond
peradventure; and, unless there is some technical ob-
jection to the manner of the gift that renders that
intention fruitless, we ought to effectuate it.

2. Let us now consider the language used by Manser in making the gift, as told by Baker: "He thought a few minutes longer and then he pulled out the two drafts and handed them to me and said: 'Whatever we do—whatever may happen, they are for you to use for yourself. They are for you. I want you to have them to use for your own use. They are yours. I want you to have these anyway.'" Standing alone here is the language of a complete gift, and, coupled with a delivery of possession, it passed the present title as a gift *inter vivos.* Taken in connection with other circumstances it was sufficient to constitute a complete gift *causa mortis.* So for the purposes of this case the distinction would seem immaterial. After the drafts were so delivered, Baker suggested an indorsement, but Manser told him it was unnecessary; that if anyone should steal them without an indorsement they would be unable to cash them; and that he would write a letter and have it fixed so that Baker could get the money. The failure of Manser to indorse the drafts is the principal argument urged by defendants' counsel in favor of the theory that there was no intention to make an absolute gift of the drafts to the plaintiff, but that the delivery was conditional in character and therefore testamentary in its nature, and, not being executed in a manner sufficient to constitute a valid will, it is void. As before stated, the language used was sufficient to constitute a gift either *inter vivos* or *causa mortis,* but taken in connection with all the circumstances, it is fair to assume that it was a gift *causa mortis,* and that if by any miracle Manser had recovered from his illness he would have expected and demanded the return of the drafts, the contingency upon which they were given having failed to come to pass. It is therefore proper to consider what constitutes a valid gift *causa mortis.*

"A gift *causa mortis* is defined to be a gift of personal property made by a person in expectation of death then imminent and upon an essential condition that the property shall belong fully to the donee, in case the donor dies as anticipated, leaving the donee surviving him, and the gift is not in the meantime revoked, but not otherwise": 20 Cyc. 1228.

"A donation *mortis causa* is that which is made to meet the case of death, as when anything is given upon condition that, if any final accident befalls the donor, the person to whom it is given shall have it as his own; but if the donor should survive, or if he should repent of having made the gift, or if the person to whom it has been given should die before the donor, then the donor should receive back the thing given": Just. Inst., lib. 2, tit. 7, quoted in 20 Cyc., *supra.*

From these definitions it appears that, to constitute a valid gift *causa mortis,* three things must concur: (1) The gift must be made with a view to the donor's death; (2) it must be conditioned to take effect only on the owner's death or by reason of an existing illness; (3) there must be an actual delivery of the possession of the thing given to the donee. The only difference between a gift *causa mortis* and a gift *inter vivos* is that in the first the donor retains the power of revocation, and the death of the donee occurring before that of the donor works revocation, while in the latter the whole title passes irrevocably with delivery of possession.

Now let us apply these elementary propositions to the case at bar. The words of the gift were absolute: "Whatever happens I want you to have these anyway. These are yours to use for your own use." The delivery was complete, and Manser's declining to indorse them was not put upon the ground that he wished to retain any further dominion over them, but because such indorsement was unnecessary and because he

thought a letter to the bank would be safer and avoid the danger of an indorsed draft falling into wrong hands.

3. There is nothing to indicate that he used the pretext of writing a letter to defeat or defer the gift, but rather to effectuate and render more convenient and safe the execution of it. He was right in saying that the indorsement was unnecessary, for it has frequently been held that the gift or sale of a negotiable instrument accompanied by an actual transfer of possession passes the title: 1 Woerner, Am. Law of Adm., § 59; *First Nat. Bank* v. *McCullough,* 50 Or. 508 (93 Pac. 366, 126 Am. St. Rep. 758, 17 L. R. A. (N. S.) 1105; *Bates* v. *Kempton,* 73 Mass. (7 Gray) 382; *Turpin* v. *Thompson,* 2 Met. (Ky.) 420; *Westerlo* v. *De Witt,* 36 N. Y. 340 (93 Am. Dec. 517); *Brown* v. *Brown,* 18 Conn. 410 (46 Am. Dec. 328). The case of *Basket* v. *Hassell,* 107 U. S. 602 (27 L. Ed. 500, 2 Sup. Ct. Rep. 415), is much relied upon by defendants and contains an exhaustive review of the authorities, but it is not in point as applied to the case at bar. In that case one Chaney, being ill and under apprehension of death, made the following indorsement upon a certificate of deposit and at the same time delivered it to Basket: "Pay to Martin Basket, of Henderson, Kentucky; no one else; then not till my death. My life seems to be uncertain. I may live through this spell. Then I will attend to it myself. H. M. Chaney." It does not appear that there was any evidence of an intent on the part of Chaney to make a gift of the money to Basket beyond the fact that he made the indorsement quoted and delivered the certificate. The indorsement was restrictive and ambiguous. The nature of the possession was interpreted in the light of the indorsement, which prevented his having control of the fund during the donor's life. It amounted to a mere order or check

on the bank to the extent of the fund, evidenced by the certificates, and indicated an intent on the part of the assignor to retain control of the money during his life.    The case carries the doctrine of judicial hostility to gifts *causa mortis* to the very extreme, and no court should go beyond it.

It is impractical to discuss at length all the authorities upon this branch of the subject. In our judgment the true criteria by which to judge the validity of a gift *causa mortis* is to be found in the case of *Leyson* v. *Davis,* 17 Mont. 220 (42 Pac. 775, 31 L. R. A. 429), which is a most exhaustive and learned review of the whole subject, and in the case of *Johnson* v. *Colley,* 101 Va. 414 (99 Am. St. Rep. 884, 44 S. E. 721.)

4, 5. The fact that after making his will the deceased caused the letter quoted to be written, and that he kept it in his possession with the intent that it should be forwarded after his death, in our judgment does not in any way bear upon his intent in delivering the drafts to plaintiff. It is to be remembered that Manser had other money in the bank besides that represented by these drafts, and this seems to have been the principal matter referred to in the letter. It is probable that he intended to include in its terms the money due on the drafts, but, if so, that intention is very imperfectly expressed.    There is nothing in the letter or in the fact of his retaining possession of it that indicates an intention of limiting the rights conveyed by the delivery of the drafts or the words accompanying their delivery. It is true that claims of gifts *causa mortis* should be closely scrutinized with a view to preventing fraud; but, when the intention of the donor is clear, mere formal and technical objections should not be allowed to defeat such intent.

The decree of the Circuit Court is affirmed.

AFFIRMED.