Argued and submitted October 17, affirmed December 4, 1996

Bruce Lee WHISNANT,
individually and as Co-Personal Representative
of the Estate of Neill Whisnant, Deceased;
and Diana Marie Nyssen,
*Appellants,*

*v.*

Frances Phipps WHISNANT,
individually and as Co-Personal Representative
of the Estate of Neill Whisnant, Deceased,
*Respondent.*

(C 950108 CV)

In the Matter of the Estate of
Neill Whisnant, Deceased.

(C93-0441PE; CA A89919)

928 P2d 999

Henry L. Bauer argued the cause for appellants. With him on the briefs was Henry L. Bauer & Associates.

Richard S. Yugler argued the cause and filed the brief for respondent.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

EDMONDS, J.

## EDMONDS, J.

This action is brought by residuary devisees for a declaratory judgment requiring the decedent's spouse to repay money to the decedent's estate withdrawn from the decedent's brokerage account four days after his death. The issue is whether the decedent made a gift *causa mortis* during his lifetime. The parties tried the case to a jury, but the trial court directed a verdict in favor of defendant after both parties moved for a directed verdict under ORCP 60. The trial court ruled that, based on the evidence, reasonable minds could not differ on the evidence and that a gift *causa mortis* occurred as a matter of law. Plaintiffs appeal, and we affirm.

Defendant is the decedent's (Neill) surviving spouse. Plaintiffs are Neill's son and daughter by a prior marriage. In August 1990, Neill and defendant purchased land in Hawaii, known as lot 16, Champion Ridge, in their joint names with the right of survivorship. To make the purchase, Neill and defendant executed a note in the sum of $545,000 to First Hawaii Bank, secured with a mortgage on lot 16. The mortgage debt required payment of interest for a period of five years and then a balloon payment of the principal balance at the end of the period. Lot 16 was intended to be used for investment purposes and Neill and defendant tried to sell it soon after the purchase. However, because it had begun to decrease in value, they were unable to sell it. At the time of Neill's death, lot 16 was valued at $448,000, which was less than the amount due on the mortgage.

Neill revised his will in October 1992. The will provided that defendant would receive all real property that Neill owned in Hawaii, a residence in Portland, a condominium in Hawaii, and a bequest of cash sufficient to pay any remaining debt due on the home and condominium. Defendant was also to receive income from a trust that Neill had created.[1] The corpus of the trust was approximately one-third of Neill's estate. The other two-thirds of the estate went to plaintiffs.

---

[1] Plaintiffs will receive the corpus of the trust when defendant dies.

Although the value of the Hawaiian property continued to decrease in value, Neill held out hope that lot 16 could be sold. Nonetheless, the evidence showed that he assured defendant that if lot 16 did not sell, he would give it to her free and clear as a gift before he died. Neill knew that defendant would be unable to satisfy the mortgage obligation, and he did not want lot 16 to be a problem for defendant after his death.

Neill had been diagnosed as having inoperable prostate cancer and stage-4 esophageal cancer. By the end of June 1993, Neill realized that his death was imminent. He had undergone a number of surgeries and his doctor had told him to live "day-by-day." Neill was in pain and becoming progressively weaker. He began to give small items away to friends and a priest was invited to administer his last rites.

On June 28, 1993, Neill asked defendant to find out the amount due to First Hawaii Bank on lot 16. Defendant determined that the amount was somewhere between $530,000 and $550,000 but the precise amount could not be determined without knowing the exact date that the loan would be paid off. Neill owned a brokerage account at Charter Investment Group, Inc. (Charter) valued in excess of 1.5 million dollars and consisting mostly of bonds. Don Parr (Parr) was Neill's broker at Charter. Neill decided to liquidate enough bonds to pay off the loan on lot 16.

On July 2, 1993, Parr met with Neill and defendant at Neill's house to discuss selling bonds from his account in order to discharge the mortgage on lot 16. Defendant testified that Neill told Parr that "I talked to you sometime ago and the time has come that I need to pay the mortgage off on lot 16. I want you to sell some bonds * * * so I can pay this debt off on this Lot 16 for [defendant]." Neill also told Parr to call defendant at a later time so that she could provide Parr with the exact amount of the pay off. Parr testified that in a transaction of this size, ordinarily "the monies are wired to whoever is to get them." Parr told Neill that he would use his discretion and sell the bonds that he thought were best. Parr assured defendant that everything that needed to be done

would be done to satisfy the mortgage. Defendant also testified that when Neill told someone to do something, it was his expectation that the task would be completed. After Parr left the residence on July 2, Neill took defendant's hand and told her that he was relieved because the mortgage debt had been taken care of for her. Also, defendant's son testified that Neill told him that he had taken care of the problem with lot 16. Neill's nurse testified that Neill had expressed similar feelings to her.

There was also evidence that on July 2, Neill discussed giving a special power of attorney to defendant that would give defendant control over his accounts at Charter. Defendant testified that Parr told Neill, "I feel, Neill, that at this time it's time to have a power of attorney for [defendant]." On July 7, 1993, Neill signed a special power of attorney. It provided defendant with control over Neill's accounts at Charter.

On July 12 and 13, Parr sold the bonds. On July 18, 1993, Neill died. On July 19 and 20, 1993, the proceeds from the bond sale were placed in Neill's Charter account. On July 22, 1993, defendant informed Parr of the account number of First Hawaii Bank and the exact amount of money needed to pay off the mortgage loan. Parr wired the money to the bank, and the mortgage was subsequently satisfied. Parr testified that he believed he was acting to complete what Neill had told him to do and that he was not acting pursuant to the special power of attorney that Neill had given to defendant.

Plaintiffs argue that Neill was the owner of the unpaid proceeds from the bonds at the time of his death and that those proceeds constitute assets of his estate. They assert that the evidence does not fulfill the requirements for a gift *causa mortis* because there "was no donative intent, no delivery, no acceptance of the purported gift and the amount of the gift was vague." They conclude that "[i]t is beyond peradventure that Neill's intent was to *pay off* the mortgage on Champion Ridge" and that "[t]here is no evidence that Neill intended to make a gift to defendant of an amount of money equal to the payoff balance." (Emphasis in original.)

As we understand plaintiffs' argument, none of the above-recited facts is controverted. They do not contend that there are issues of fact about what Neill intended regarding the payment of the mortgage.[2] Rather, plaintiffs contend that, as a matter of law, there could not have been a gift *causa mortis* under the above circumstances and that therefore, the trial court erred in directing a verdict in defendant's favor.

There are four basic elements to a gift *causa mortis.* First, the gift must be made in anticipation of impending death. Second, there must be donative intent. Third, there must be delivery of the gift to the donee. Fourth, the donee must accept the gift. Furthermore, although the right to ownership passes to the donee at the moment of delivery, ownership or control does not become absolute unless and until the donor dies from the impending peril, the donor dies before the donee, and the donor does not revoke the gift before the donor's death. *Kesterson v. Cronan*, 105 Or App 551, 554, 806 P2d 134, *rev den* 311 Or 426 (1991). The one claiming a gift *causa mortis* must prove the elements of the gift by clear and convincing evidence. *Id.*

Plaintiffs do not dispute that Neill intended to pay off the joint debt on lot 16. Rather, according to them, "that is quite different from an intent to make a present gift of money to the defendant to be used for that purpose." Plaintiffs' perceived difference is not apparent to us. The satisfaction of a debt may be the subject of a gift to the debtor when done with the requisite donative intent. *Miller v. Miller*, 29 Or App 723, 727, 565 P2d 382, *rev den* 280 Or 1 (1977).

Whether donative intent exists requires us to look at the statements made by the donor and the surrounding circumstances at the time of the purported gift. *See Baker v. Moran*, 67 Or 386, 390-92, 136 P 30 (1913) (the court looked at statements made by donor and the surrounding circumstances to determine whether the donor intended to make the gift); *Waite v. Grubbe*, 43 Or 406, 410-13, 73 P 206 (1903). In this case, Neill's statements on July 2 and the circumstances

---

[2] There are disputed fact questions concerning what was intended regarding the power of attorney. However, those fact questions are immaterial because of our holding that "delivery" occurred before the execution of the power of attorney.

surrounding his contact with Parr clearly establish donative intent.

■ Neill specifically said he wanted to pay off the mortgage for defendant.[3] Neill knew that defendant would be unable to satisfy the mortgage obligation, and he did not want lot 16 to be a problem for defendant after his death. Defendant was responsible for an indebtedness that could not be satisfied by the sale of lot 16 or the vesting of the sole ownership of lot 16 in defendant. Neill wanted to remedy that problem by paying off the mortgage. The subject of the purported gift was the payment of a debt. Neill did not intend to give the bonds or the proceeds of the sale of the bonds to defendant.[4] Rather, he intended to use those assets as a means to confer a gift on defendant, *i.e.*, the benefit of the satisfaction of a debt for which she was obligated. We agree with the trial court that no reasonable person could dispute that Neill had the donative intent on July 2 to make a gift to defendant.

■ At oral argument, plaintiffs' counsel suggested that Neill intended to pay off the debt himself and, therefore, even if he intended to create a benefit for defendant, that intention was never fulfilled. We believe that argument is best analyzed under the issue of whether a "delivery" occurred. Generally, for the delivery of a gift to occur, there must be a complete parting of control over the subject matter of the gift. *Liebe v. Battmann*, 33 Or 241, 245, 54 P 179 (1898). Delivery may be actual, constructive, or symbolic[5] but it must be as perfect and complete as the nature of the gift and the attendant circumstances and conditions will permit. *Waite*, 43 Or at 410.

---

[3] Plaintiffs do not dispute that Neill made such statements, nor do they claim that the statements were made because of fraud, duress or undue influence.

[4] Plaintiffs argue that the gift was vague and uncertain because the pay off amount for the mortgage debt changed daily due to the accruing interest. Although the amount of the mortgage debt changed due to the interest, the gift itself was not vague or uncertain. The gift was to pay off the mortgage debt and that is the gift that defendant received.

[5] See *Whitney v. Canadian Bank of Commerce*, 232 Or 1, 6-25, 374 P2d 441 (1962) (Warner, J., dissenting), for a thorough discussion of the element of delivery for a gift *causa mortis*.

In *Waite*, the court held that when an ill father took his daughter into the backyard of his home and pointed out to her where his gold coins were buried, that act constituted a sufficient delivery of the coins despite the fact that the daughter did not actually retrieve the gold coins until nearly nine months after her father's death. 43 Or at 413. The court explained:

> "Where the intent to bestow is obvious and clear, and the language and deportment of the donor indicate a belief upon his part that he has done all that is necessary to accomplish his purpose, they come to the aid of the act of delivery, if slight and ambiguous, but not to dispense with it as an essential element of a valid gift." *Id*. at 412.

Although there was no tangible "symbol of delivery" that passed from the donor to the donee, the court held that "[b]y imparting to the daughter the information as to the location of the deposits by specifically pointing them out to her, he, in effect, gave her the key to his safety vault * * * whereby she was enabled to unlock it, and take the deposits therefrom." *Id*. at 413.

The holding in *Waite* is instructive. The fact that nothing tangible transferred from Neill to Parr during their July 2 discussion is irrelevant under the court's holding in *Waite*. We also note that although Parr's authority as Neill's agent terminated on Neill's death, that fact does not negate the completion of the gift. When a donor has the requisite donative intent to pass title of a gift, the gift is completed at the moment the donor delivers it to a third person. *See McCredie v. McCredie*, 134 Or 517, 522, 294 P 361 (1930) (holding that "delivery to a third person * * * is as effectual to make the gift valid as delivery to the donee personally"); *see also In re Bacon's Estate*, 32 NE2d 433, 434 (Oh App 1 Dist 1935) (holding that the death of donor before a third person actually delivers the gift to donee does not defeat the gift).

"Delivery" *to defendant* occurred when Neill spoke to Parr on July 2. When Neill told Parr to sell the bonds and pay off the mortgage, he believed that he had done everything that he thought necessary under the circumstances to complete the gift. He had given up dominion and control over the assets that needed to be sold to accomplish his purpose. His

directions to Parr were to complete the task assigned without further control on his part. Neill told Parr to use his discretion and sell the bonds that he thought were best able to complete the satisfaction of the mortgage debt. Parr testified that in a transaction of this size, ordinarily "the monies are wired to whoever is to get them." Parr assured defendant that everything that needed to be done would be done. As far as Neill was concerned, the matter was now out of his hands, there was nothing else he needed to do and Parr had complete control over the matter. By his words to Parr, Neill delivered for defendant's benefit the "gift" of the payment of the debt. Moreover, defendant was present throughout the July 2 conversation and acted in accordance with Neill's wishes. That conduct is a manifestation of her acceptance of the gift. *See Manning v. U.S. Nat. Bank*, 174 Or 118, 137, 148 P2d 255 (1944) ("acceptance of a gift of a beneficial nature is presumed").

In *Baker v. Moran*, the court stated:

> "It is true that claims of gifts *causa mortis* should be closely scrutinized with a view to preventing fraud; but, when the intention of the donor is clear, mere formal and technical objections should not be allowed to defeat such intent." 67 Or at 395.

That principle is applicable to the facts of this case. There is no evidence of fraud or mistake in this case. As far as Neill was concerned, there was nothing left for him to do to complete the gift, and he expressed his belief that the matter had been completed. It follows that plaintiffs' objections should not be allowed to defeat Neill's uncontroverted intention to confer a gratuitous benefit on defendant. Accordingly, we affirm the trial court.

Affirmed.