Argued and submitted July 17, 2001, reversed and remanded with instructions
January 23, 2002

In the Matter of the Estate of
Virginia Lee Bessett, deceased.

Dale BESSETT,
personal representative of the Estate of
Virginia Lee Bessett, deceased,
*Appellant,*

*v.*

Edwin M. HUSON,
*Respondent.*

16-99-09347; A111159

39 P3d 220

George W. Kelly argued the cause and filed the brief for appellant.

Paul D. Clayton argued the cause and filed the brief for respondent.

Before Edmonds, Presiding Judge, and Kistler, Judge, and Van Hoomissen, Senior Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiff is the personal representative of the estate of Virginia Bessett (Bessett). He brought this action against defendant based on multiple promissory notes that were executed by defendant in favor of Bessett. The notes represented money that Bessett loaned to defendant during her lifetime. The parties entered into a stipulated facts trial. Defendant agrees that he is liable on the notes unless he prevails on his affirmative defenses. The trial court ruled that Bessett had cancelled the obligations through a gift, evidenced by a letter found in her belongings after her death. We review to determine if the stipulated evidence proves either of the affirmative defenses and reverse.

Bessett was involved in a relationship with defendant during her lifetime. During their relationship, she made multiple loans of money to him, and he executed promissory notes to evidence the loans. The first note was executed on June 21, 1993, and the last note was executed on April 3, 1995. Bessett kept possession of the notes. At some point before she died, she wrote an undated letter to defendant, stating that, because of her affection for him, she wanted him to mark each note "paid in full" upon her death.[1] The letter was signed by Bessett and was found in Bessett's safe in a sealed envelope marked, "This is to be given to [defendant]. This is very personal." There is no evidence as to when the letter was written.

Plaintiff initiated this action after unsuccessfully seeking payment on the notes from defendant. At trial, defendant raised two affirmative defenses to enforcement of the notes. He argued that the letter was evidence that Bessett had cancelled the obligations as a gift, or alternatively, that the letter was the type of "signed writing" under ORS 73.0604 that renounced Bessett's right to collect on the obligations.

---

[1] The letter was not dated. It read, in part:

"My dearest Edwin, This may come as a shock to you. Please mark all unpaid notes paid in full as of the date of my death."

The trial court resolved the case on the first affirmative defense. It ruled that:

"As pointed out in *Whisnaut v. Whisnaut*, 145 Or App 87[, 928 P2d 999] (1996), 'there are four elements to a gift *causa mortis*. First, the gift must be made in anticipation of impending death. Second, there must be donative intent. Third, there must be delivery of the gift to the donee. Fourth, the donee must accept the gift.' *Id.* at 92. Of these four elements, only the third, delivery, is in serious question in this case.

"* * * * *

"Delivery of a gift 'may be actual, constructive, or symbolic, but it must be as perfect and complete as the nature of the gift and the attendant circumstances and conditions will permit.' The difficulty in analysis here is: what is the gift? Is it the money or the satisfaction? To some extent it must be both. It is reasonable to infer that the donor intended the money as the gift and did not view the delivery of the satisfaction as being anything other than a formality. In this case the donee already has the money. The satisfaction was clearly meant to be provided to him upon decedent's death and reflects the donor's (already performed) act of forgiveness. It was decedent's intent that donee serve as her personal representative. This insured [*sic*] that the forgiveness letter would be acted upon by someone in an official capacity. These facts, taken together, convince me that there was at least symbolic, and probably constructive, delivery. Since 'the intention of the donor is clear, mere formal and technical objections should not be allowed to defeat such intent.' *Baker v. Moran*, 67 Or 386[, 395, 136 P 30] (1913). Accordingly, I rule in favor of the Defendant."

We review for errors of law and conclude that the evidence does not satisfy the legal requirements for a gift *causa mortis* or a gift *inter vivos*. In *Kesterson v. Cronan*, 105 Or App 551, 554, 806 P2d 134, *rev den* 311 Or 426 (1991), we explained,

"In order for a gift of personal property, whether *inter vivos* or *causa mortis* to be valid, there must be a donative intent, coupled with the delivery of the subject of the gift to the donee with the intent that the donee have a present interest in it and an acceptance by the donee. A gift *causa mortis* differs from an *inter vivos* gift in that the former

must be made in anticipation of impending death and, although title passes to the donee, it is an incomplete title that does not become absolute until the donor dies from the impending peril before the donee and without having revoked the gift. An *inter vivos* gift vests absolute title in the donee."

■ Gifts that are to be effective only after the death of the donor are disfavored by the law. *Grignon v. Shope*, 100 Or 611, 618, 197 P 317 (1921). They are "liable to occasion fraud and are subject to many mistakes." *Id.* They are "made without the safeguards cast by the law around the execution of wills." *Id.* The policy underlying the common-law requirements for the enforceability of a gift *causa mortis* exist because of the lack of formalities of a testamentary disposition. By requiring proof of impending death and the lifetime delivery of the gift, the risks of fraud and dishonesty that imperil gifts made after death are reduced. Those requirements act as a legal substitute for the execution of a formal will signed in front of competent witnesses. *Id.*

The facts in *Kesterson* illustrate the problems that can occur with gifts that are intended to become effective after the donor's death. In that case, the decedent loaned money to the defendant. The decedent kept the notes reflecting the loan in a safe deposit box. The decedent then arranged for Buell, a friend, to have access to the safe deposit box and told him to give the notes to the defendant after the decedent died. After the decedent died, Buell acted on the decedent's expressed wishes by delivering the notes to the defendant.

In that case, the record satisfied the imminent death requirement. Focusing on the elements of delivery and donative intent, we said:

"[E]ven if the envelope that Buell took from the safe deposit box had contained the original note signed by [the decedent], it was not delivered to defendant before [the decedent] died. Defendant contends that [the decedent] delivered the envelope to Buell as defendant's agent, therefore, it had been delivered to him or for his use. The evidence, however, does not support an agency relationship between Buell and defendant.

"* * * * *

"Although the record supports defendant's claim that [the decedent] intended to forgive the debt on his death, it does not show that [the decedent] intended defendant to have any ownership interest in the note before [the decedent] died or that the note had been delivered to defendant. Defendant continued to make, and [the decedent] continued to receive, payments on the note after the alleged gift was made until [the decedent's] death. Therefore, even if the note had been delivered to defendant before [the decedent's] death, the evidence shows that [the decedent] intended to make a gift that was to take effect at his death, not before. That was an attempted testamentary disposition that was not accompanied by a writing executed with the formalities of a will." *Kesterson*, 105 Or App at 555 (citations omitted).

■ Here, neither the letter nor the notes were delivered to defendant during Bessett's life. Bessett kept the notes in her possession, and, until delivery of the letter occurred, she retained the unfettered right to enforce the obligations owed under them. Moreover, no constructive delivery occurred here. There is no evidence that defendant had access to the safe, nor that anyone else had been instructed during Bessett's life to open the safe and remove or exercise control over the letter. Thus, the evidence does not show that Bessett intended defendant to have *any* present ownership interest in the notes.

■ Additionally, there is no evidence as to when the letter was written and signed. The record does not contain any evidence of Bessett's physical condition at any time nor of any belief on her part that she was soon to die. The imminent death requirement cannot be inferred simply from her advanced age. *See Allen v. Hendrick*, 104 Or 202, 220-22, 206 P 733 (1922). Thus, no gift *causa mortis* can be found on these facts.

■ In contrast, an *inter vivos* gift transfers the interest in the subject property unconditionally, at the time of delivery of the gift. *Kesterson*, 105 Or App at 554. It requires delivery, a donative intent, a present vesting of unlimited rights in the gift in the donee, and acceptance. *Id.* An *inter vivos* gift, once delivered, cannot be revoked. *Id.* Such gifts are legally recognized without difficulty when all the elements are

proved. Here, however, there is no evidence that the letter was intended to convey a present ownership interest unconditionally. Rather, the letter's language shows that Bessett intended the gift to have effect only after her death. For the above reasons, the evidence is insufficient to support defendant's defense that Bessett cancelled his obligations.

 The trial court did not reach defendant's second affirmative defense under ORS 73.0604, because it held that the notes had been cancelled by a gift. We turn to the statute to discern whether defendant demonstrated all of the elements necessary for a renunciation under the statute. Our task in interpreting a statute is to discern the intention of the legislature. We begin that analysis by examining the text and context of the statute. If the answer to our inquiry is clear from that examination, we go no further with our inquiry. ORS 73.0604 (1999)[2] provided, in part:

> "A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument:
>
> "* * * * *
>
> "(b) By agreeing not to sue or otherwise renouncing rights against the party by a signed writing."

The letter in this case is clearly a signed writing, as that term is defined in ORS 71.2010(39) and (46) (1999).[3] The question is whether, by executing the signed writing and putting it into her safe, Bessett fulfilled the requirements of the statute that would effectuate the cancellation of the obligations.

---

[2] ORS 73.0604 is part of the Oregon enactment of the Uniform Commercial Code (UCC), and it governs negotiable instruments. For purposes of this case, there is no debate about the proposition that the notes are, in fact, negotiable instruments.

[3] ORS 71.2010 provides, in part:

"(39) 'Signed' includes any symbol executed or adopted by a party with present intention to authenticate a writing.

"* * * * *

"(46) 'Written' or 'writing' includes printing, typewriting or any other intentional reduction to tangible form."

A signed writing was similarly defined in ORS 71.2010 (1991), which was the statute in effect when some of the notes here were written.

*Webster's Third New Int'l Dictionary*, 1922 (unabridged ed 1993), defines "renounce" as:

"To report back, retract, renounce 1 obs : ANNOUNCE, DECLARE, PROCLAIM 2: to announce one's abandonment of the ownership of: give up, abandon, or resign, usu. Formally 3 : to give up or abandon (something practiced, professed, intended) 4 : to refuse further to follow, obey or recognize : cast off : DISCLAIM, REPUDIATE 5 a : revoke b : REFUSE 1: to make a renunciation 2 a: REVOKE b: REFUSE 3: to abandon, decline, or resign formally some legal right or trust (as citizenship)."

The definitions of "renounce" suggest that a declaration is necessary. The synonyms, "announce," "declare," and "proclaim," all connote some kind of affirmative act.[4] The last definition, "resign *formally* some legal right," also suggests that a renunciation requires more than an unexpressed decision not to enforce one's contractual rights.

As to context, subsection (a) of ORS 73.0604 authorizes a note to be discharged by "an intentional voluntary act," such as surrender of the instrument, destruction, mutilation, or cancellation of the instrument, or the addition of words to the instrument indicating discharge. Each of those acts must be performed affirmatively. The other method of discharging an obligation under the statute is by "*agreeing* not to sue," which also contemplates more than an unexpressed intention. The fact that "renunciation" is found in a list of actions that must affirmatively be taken by a donor in order to have the effect of cancellation is evidence that a renunciation is also intended to be made through an affirmative act that objectively manifests the donor's intent.

---

[1] As to "renounce," *Black's Law Dictionary*, 1460 (5th ed 1979), similarly provides:

"To make an affirmative declaration of abandonment. * * * To reject; cast off; repudiate; disclaim; forsake; abandon; divest one's self of a right, power or privilege. Usually it implies an affirmative act of disclaimer or disavowal."

*Black's* defines "renunciation" as:

"The act by which a person abandons a right acquired without transferring it to another. * * * Under the Negotiable Instruments Law the unilateral act of the holder, usually without consideration, whereby he expresses the intention of abandoning his rights on the instrument or against one or more parties thereto." *Id.*

■ ■ That understanding is supported by Oregon law, which enforces contracts based on an objective theory, and not a subjective, unexpressed understanding of one party to the contract. *See Kabil Developments Corp. v. Mignot*, 279 Or 151, 157, 566 P2d 505 (1977), *quoting Kitzke v. Turnidge*, 209 Or 563, 573, 307 P2d 522 (1957) ("The law of contracts is not concerned with the parties' undisclosed intents and ideas. It gives heed only to their communications and overt acts."). Renunciation of a contractual right to collect on enforceable notes would appear to require a similar communication. Thus, the text and context of ORS 73.0604 indicate that the renunciation must be manifested before it is effective. However, we need not decide whether the stipulated facts in this case satisfy that requirement.

Even if the signed letter constitutes a "renunciation" as contemplated by ORS 73.0604 (1991) and ORS 73.0604 (1999), the issue remains whether delivery of the letter was required to make the renunciation in the letter enforceable. Two different versions of ORS 73.0604 are in play in this case. A prior version of ORS 73.0604 was in effect when some of the notes in this case were executed. ORS 73.0604 (1991) provided, in part:

"The holder of an instrument may even without consideration discharge any party:

"* * * * *

"(b) By renouncing the rights of the holder by a writing *signed and delivered* or by surrender of the instrument to the party to be discharged." (Emphasis added.)

The difference between the former statute and the current statute is that the former statute required the delivery of the signed writing, and the current statute does not. The parties do not address the import, if any, of the amended statute's omission of the delivery requirement.

Bessett's letter is not dated, and there is no evidence as to when she wrote it. It is as equally inferable from the evidence that she wrote and signed the letter before November 3, 1993, the effective date of the amendment to ORS 73.6040,

as it is that it was signed after that date. The absence of evidence as to when she signed the letter presents an insurmountable problem of proof for defendant. To prevail under the statute, defendant must show that Bessett complied with the statutory requirements in effect at the time of the making of the renunciation. If the letter was signed before November 3, 1993, it was an invalid renunciation, and had no effect on any of the notes, because it was not delivered. If, instead, it was signed after November 3, 1993, the renunciation could be effective, but only as to the notes executed before the renunciation. Without proof as to when the letter was signed, defendant cannot carry his burden of persuasion that Bessett's signed but undelivered letter cancelled all or part of the obligations that he owes.

Defendant relies on *Portland Iron Works v. Siemens*, 135 Or 219, 295 P 463 (1931) for the proposition that a renunciation may occur without delivery of the instrument evidencing the renunciation. In that case, the governing statute allowed renunciation either by a signed, absolute and unconditional writing, or by delivery of the instrument to the debtor. Neither requirement of the statute was met. Instead, the party seeking to prove renunciation in *Portland Iron Works* relied on oral evidence of a substitute transaction as evidence that the maker of the note intended to relieve the debtors of liability on the note. The court held that the statute requiring renunciation by a signed writing or by delivery was not satisfied by that evidence. We perceive nothing in the holding of *Portland Iron Works* that supplies the missing proof under ORS 73.0604. Accordingly, we hold that the trial court erred when it held for defendant, because he has failed to prove either affirmative defense.

Reversed and remanded for entry of judgment on the promissory notes.