Argued October 28, affirmed December 11, 1963

## STIREWALT et al *v.* CHILCOTT et ux

387 P. 2d 351

*J. R. Campbell,* John Day, argued the cause for appellants. On the briefs were Yokom & Campbell, John Day.

*Herbert H. Anderson,* Portland, argued the cause for respondents. With him on the brief were Koerner, Young, McCulloch & Dezendorf and James H. Clarke, Portland.

Before McAllister, Chief Justice, and Rossman, Perry, O'Connell, Goodwin, Denecke and Lusk, Justices.

## DENECKE, J.

This is a suit to impress a constructive trust upon 1182 acres of grazing land upon the ground that the land was transferred to the defendants by mistake.

The entire transaction was an involved one. A simplified version of the facts is believed sufficient. The land is on top of the rim of the canyon of the John Day River. It is sometimes referred to as the Black Snag Springs Land and will be referred to as Black Snag. The land is the property of the United States but was leased to the Hurlburts. The Hurlburts operated the W-4 Ranch, consisting of deeded and leased land, including the 1182 acres. The plaintiffs operate a ranch just west of the W-4. In the spring of 1961 the Hurlburts agreed, for consideration, to assign the lease on the Black Snag land to plaintiffs. Documents to accomplish this were executed and taken to the appropriate government office. The documents were not sufficient to accomplish the assignment and it was never effective. The evidence is conflicting whether the Hurlburts were informed by the government that the assignment had not been consummated. Plaintiff did not know until December, 1961, that the assignment had not been completed.

In the spring of 1961 the Hurlburts started negotiating with the defendants to sell them the W-4 Ranch.

The sale was made in November, 1961. By the contract of sale the Hurlburts assigned all their leased land, *not excluding* the Black Snag Springs area. Defendants applied to the government for a new lease for all these lands, including the 1182 acres. A new lease was entered into in December, 1961. Thereafter, plaintiffs requested the government to enter into a new lease with them for the Black Snag area. It refused, as it had already leased such lands to the defendants.

The plaintiffs alleged that the defendants knew the Hurlburts did not intend to transfer to them the Black Snag land and that the Hurlburts only did so because of a mistake. The trial court so found and made a decree imposing a trust upon the land.

██ Before passing upon the principal question, it is first necessary to decide an ancillary issue raised by defendants. They moved to dismiss the complaint because of a lack of necessary parties. These necessary parties, defendants contend, are two mortgagees of the Hurlburts who have a prior mortgage lien upon the Hurlburts' leasehold interest in the 1182 acres. Defendants claim the mortgagees are necessary parties because "a complete determination of the controversy can not be had without the presence of other parties * * *." ORS 13.110. We deem this similar to a mortgage foreclosure suit in which the principle is well accepted that, if one having an interest in the property, by mortgage or otherwise, is not joined as a party, such interest is unaffected by the decree. Such other interest holders are regarded as proper, but not necessary, parties. *Masters v. Chambers,* 241 Ala 623, 4 S2d 261 (1941) (a suit to impress a trust); Osborne, Mortgages, 936, § 322. The fact that the mortgage debt may be accelerated if plaintiffs prevail does not make the mortgagees necessary parties. The mortgagees were

not necessary parties, and the trial court was correct in refusing to dismiss the suit.

The Hurlburts' grazing lease with the government is not in evidence, but apparently the Black Snag area was not separately described in such lease. The inference is that the lease listed approximately 50 sections or portions of sections describing all the leased land. To identify the Black Snag area in such a description one would have to know the sections or portions of sections constituting the Black Snag land. There is no evidence that the Chilcotts, or the attorney drafting the documents of sale, knew the legal description of the Black Snag area or of any of the leased lands.

Mr. Chilcott testified that Mr. Hurlburt advised him that he had assigned the lease on part of the government land to Stirewalt. He stated that Hurlburt spoke as if this were an accomplished fact, completed some time ago. Chilcott also testified that Hurlburt had generally indicated by a wave of the hand the area he had previously assigned to Stirewalt. The Hurlburts stated they had also identified the area for Chilcott on a map. This Chilcott denied.

The attorney drafting the documents of sale originally represented the Hurlburts. Later, with their consent, he also represented the Chilcotts in the sale. He had been informed that previously the Hurlburts had assigned some of their leased land to the Stirewalts. He denied Hurlburts' testimony that they had instructed him to exclude the land previously assigned to Stirewalt, except as this may have been what was intended by a reference in the contract to fencing. Based upon information given the attorney by Hurlburt, the contract of sale recites:

"Sellers have further represented that outside fencing of the property is complete, except for a

> two and one-half (2½) mile section and except for certain properties heretofore contained in the BLM [leased government] land attached to this ranch, which has been released onto a neighbor whose name is Starwell [sic], and Sellers herein represent that it is Starwell's [sic] obligation to fence such property. * * *"

The attorney testified he did not intend to exclude from the contract of sale any land which had been operated as part of the W-4 Ranch, whether it be deeded or leased land. The agreement of sale provided:

> "* * * the sellers do * * * convey * * * that certain property known as the W-4 Ranch containing 12,000 acres of deeded land (more or less) and 11,000 acres of taylor [sic] grazing land * * * the Taylor Grazing lands being described in that certain lease from the United States of America located in the Burns office bearing date 12/13/60 and Identification No. being 02–118, * * *."

The Black Snag area was part of the land leased under such described lease. Excluding the Black Snag area, the buyers received more than 11,000 acres of leased land.

To transfer the title to the land they held in fee the Hurlburts delivered a deed to the buyers. To transfer land leased from the government it is necessary for the lessee to execute an assignment of the lease to the transferee. The transferee then submits this assignment, together with an application to lease such land, to the government. If the government approves, it makes a new lease with the transferee. In this case the attorney discovered sometime after the contract had been entered into that the lease under which the Hurlburts had been operating was to one Dixon, a former mortgage creditor of the Hurlburts. Therefore,

the assignment was prepared for Dixon's signature and he signed it. The assignment described the land as "All properties covered by previous lease."

On the printed government form, "Application to Lease," executed by the Chilcotts, in the blank in which the legal description of the land to be leased is to be inserted, there only appears: "See Exhibit 'A.'" The inference from the attorney's testimony is that Exhibit "A," which contains a description of all the leased land, including the Black Snag land, was prepared by the government and attached after the application was received.

The government approved the application and entered into a new lease with the Chilcotts covering the same land which had been in the former lease, including the Black Snag land.

Stirewalt testified he thought he had secured transfer of the Black Snag land when he and Hurlburt executed the transfer documents and they were sent to the appropriate government office. He learned the contrary when he received a letter from the government enclosing additional forms and stating that, when they were executed and returned, the government could complete the assignment. This letter was sent just a few days before Chilcott's application was received. The lease to the Chilcotts was made prior to Stirewalt's returning the properly executed forms to the government. Upon their receipt the government notified the Stirewalts that it could not enter into a lease with him as it had already leased the land to the Chilcotts. Chilcott refused to transfer the Black Snag lease to Stirewalt; therefore, this suit was brought to accomplish that result.

The fundamental error of the defendants is their legal classification of this case. They have placed it in

the contract category of unilateral mistake. In such cases the knowledge of the other party and the diligence of the mistaken party are relevant. *G. E. Supply Corp. v. Republic Cons. Corp.*, 201 Or 690, 272 P2d 201 (1954), is an example of this type of problem. In that case the seller made a mistake in computing its offer and, therefore, contracted to sell at a lower price than it would have if there had been no mistake made. This court refused to rescind the contract because the buyer did not know and could not reasonably have known of the seller's unilateral mistake. In that case the buyer's bargain was the price stated in the contract. He intended to buy at the contract price.

■ This case is not one of unilateral mistake. It is an instance of unjust enrichment at the expense of another. More specifically, it can be categorized as unjust enrichment occurring by means of a mistake in description of the thing sold, whereby a greater amount of land was transferred than was intended by either party.

In the introductory note to the chapter on mistake in the Restatement of Restitution, the statement is made:

"* * * Likewise, restitution is normally granted to a person who, in a transaction with another, gives substantially more or receives substantially less than was contemplated by the parties in making the bargain * * *." Restatement 27, Restitution § 5.

The defendants have stated that the principal issue here is: Did the defendants know that the Hurlburts made a mistake by transferring the Black Snag area to the defendants? Rather, the issue is: Did the defendants intend the Hurlburts to transfer to them the Black Snag area? The evidence is overwhelming that they did not.

As Mr. Chilcott, Sr., testified, after stating that Hurlburt, had generally indicated where the land assigned to Stirewalt lay:

> "I had no idea what land he was talking about. I had no interest in it. It was represented to me as an accomplished fact that the transfer had been made to the Stirewalts, and I had no further interest, and I paid no attention."

It is immaterial whether or not the transfer was an "accomplished fact" or had not been effected. The important fact is that Hurlburt did not intend to convey the Black Snag area, and Chilcott did not intend to have it conveyed.

The mistake occurred in the legal description of the lands transferred as set forth in the contract of sale. The description encompassed more land than either party intended. It transferred all of the Hurlburts' interest in their lease with the government, whereas it should have excepted the Black Snag Springs area. Hurlburt was unaware that the contract transferred the Springs area, and there is no evidence whatsoever that Chilcott was aware that the land assigned to Stirewalt was included. The inference is inescapable that if the contract had specifically excepted the Springs area from the description of the leased lands transferred, the buyers would have had no objection.

If the Hurlburts, prior to the contract of sale with the Chilcotts, had effectively assigned the Springs area lease to the Stirewalts with government approval, the same mistake was still embodied in the contract of sale; the description in the contract of sale transferred more than the parties intended.

When viewed in this light, the case is similar to *O'Brien v. Michels,* 222 Or 399, 352 P2d 735 (1960),

and *Heltzel v. Baird,* 90 Or 156, 175 P 851 (1918). In the former decision this court stated:

> "* * * In 5 Williston, Contracts (rev ed), p 4345, § 1550, the applicable rule is stated as follows:
>
> > " 'Where a deed conveys a different or larger estate or right than was intended, and both parties shared an intent as to the estate which should have been conveyed, the grantor is allowed a reformation of the instrument so that it shall express this intent; * * *.' " (222 Or at 405)

There, the suit was between the parties to the conveyance; therefore, reformation was the appropriate equitable remedy. Here, the parties were not the parties to the agreement; so the imposition of a constructive trust is the appropriate remedy. *Scott v. Freedom Development Corporation,* 219 NYS2d 494 (1961), involved a mistake in the legal description in the conveyance and the court impressed a trust upon the property mistakenly conveyed.

The decree is affirmed.