Argued and submitted September 17, 2020, reversed and remanded
December 8, 2021, petition for review denied May 19, 2022 (369 Or 733)

Deborah NEEL,
*Plaintiff-Appellant,*

*v.*

Dana LEE
and Tammie Lee, husband and wife,
and Danielle K. Lee,
*Defendants-Respondents.*

Marion County Circuit Court
17CV43527; A170408

504 P3d 26

Plaintiff appeals from a judgment dismissing her two claims—one for financial abuse of a vulnerable person and another for restitution due to unjust enrichment. The claims arose out of the plan of related family members to combine resources to buy a residential property to live together. On appeal, plaintiff assigns error to the trial court's summary judgment rulings that defendants did not take a vulnerable person's money or property wrongfully and that no evidence supported a claim of unjust enrichment. *Held*: Plaintiff presented a genuine issue of material fact whether defendants wrongfully took plaintiff's money or property interest where circumstances could be found to support a finding that financial abuse of a vulnerable person occurred through misrepresentation by nondisclosure. Plaintiff also presented a genuine issue of material fact whether a supposed contract failed for lack of essential agreement among the parties, thereby leaving defendants unjustly enriched and warranting restitution. Accordingly, the trial court erred in dismissing plaintiff's claim for financial abuse of a vulnerable person and her claim for restitution due to unjust enrichment.

Reversed and remanded.

Courtland Geyer, Judge.

Matthew J. Kalmanson argued the cause for appellant. Also on the briefs was Hart Wagner LLP.

Tricia M. Olson argued the cause for respondents. Also on the brief was Heltzel Williams PC.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Brewer, Senior Judge.

DeVORE, P. J.

Reversed and remanded.

**DeVORE, P. J.**

Plaintiff Neel appeals from a judgment dismissing her two claims—one for financial abuse of a vulnerable person and another for restitution due to unjust enrichment. The claims arose out of the plan of related family members to combine resources to buy a residential property to live together. Plaintiff first assigns error to the trial court's summary judgment ruling that defendants did not take a vulnerable person's money or property wrongfully. *See* ORS 124.110(1)(a) (providing statutory claim for financial abuse of a vulnerable person).[1] Defendants contend that there was no wrongful taking, because they made no misrepresentation and because plaintiff's contribution to the purchase was nothing but a gift. Plaintiff next assigns error to the trial court's summary judgment ruling that no evidence supports a claim of unjust enrichment. Defendants contend that the circumstances do not match any established pattern that warrants restitution.

We reject defendants' arguments and conclude that the summary judgment rulings were error. We first determine that plaintiff presented a genuine issue of material fact whether defendants wrongfully took plaintiff's money or property interest when circumstances could be found to impose upon defendants a duty to give notice and secure plaintiff's consent before taking plaintiff's money and initiating a change to the purchase documents to remove plaintiff from the transaction and title to the property. A jury could find that misrepresentation by nondisclosure was abuse of a vulnerable person under ORS 124.110(1)(a). Next, we determine that plaintiff presented a genuine issue of material fact whether plaintiff transferred to defendants $169,000 as part of an agreed plan to buy property for a joint living arrangement, whether that plan failed for lack of agreement about plaintiff's interest, and whether

---

[1] In relevant part, ORS 124.110(1)(a) provides that an action may be brought under ORS 124.100 for financial abuse

"[w]hen a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person."

that failure left defendants unjustly enriched, warranting restitution to plaintiff. Accordingly, we reverse and remand.

## I.   BACKGROUND

On review of rulings on motion for summary judgment, we review the record to determine if there are genuine issues of material fact. *Bayview Loan Servicing v. Chandler & Newville*, 292 Or App 562, 569, 426 P3d 153, *rev den*, 364 Or 209 (2018) (citing ORCP 47 C); *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to plaintiff, because she is the party opposing the motion. *Id.*

### A.   *Facts*

Plaintiff Neel and defendant Dana Lee are sister and brother, respectively. Defendants Dana Lee and Tammie Lee are husband and wife. Defendant Danielle Lee is their adult daughter. Plaintiff, who is single, discussed with her brother moving from Tennessee to Oregon, to buy property together, and to live with his family in a "family compound." Together, they made an earlier purchase offer, which was not accepted, on another property, which would have involved her "participation" of "around $80,000." In her deposition, plaintiff recalled her conversations with her brother:

> "First thing I remember is that *we* was always used in buying a property. His terminology always was a *we*, not his family would buy it and I would be invited to come and live there[,] but *we* would buy the property. That included me. So my initial involvement in all of this was to be a co-purchaser of the property[.]"

(Emphases added.) Dana Lee sent plaintiff several financial statements that plaintiff described "as to what he felt our combined team could afford, not just his family but with me included." Plaintiff explained that defendants could not afford the properties at which they were looking without her "participation." Her interest was to move to Oregon to live with family in a "combined purchase * * * situation."

Plaintiff brought to defendants' attention a State Street property. Her understanding was, "We would make an offer on the house and buy it." Her intent was to be "an owner of the State Street property," appearing on its title. To her, being on the title was "was what the money was for." She testified that she never would have entered into the transaction if she were not on the title. When the parties made a purchase offer on the property, it was made with plaintiff's and defendants' names, each as a "buyer." Plaintiff and defendants each had engaged in a "Disclosed Limited Agency Agreement for Buyers" with a real estate firm and its licensee, Huhn. Accordingly, their purchase offer included a "Final Agency Acknowledgement" that showed plaintiff as well as defendants as "buyers."

Dana Lee told plaintiff that the bank required that she be on the "mortgage," meaning the loan, in order to be on the title. In response to defendants' motion for summary judgment, plaintiff declared that her brother's statement was false, because she later learned that the lender had agreed to allow her niece Danielle Lee to be on the title without being on the mortgage debt.[2] Plaintiff believed that defendants' financial statement showed that they could carry the debt with her cash participation and without further contribution from her. In response to her brother's statement, plaintiff told her brother that she was not willing to put "all of this money" into the purchase *and* commit to a mortgage debt when she did not expect to be working. In her deposition, plaintiff testified that her brother's position allowed "no wiggle room." She testified:

> "From my position, I have absolutely no incentive to put money into a property that I do not have a name on the title in. It's my money going into the property. I'm on the purchase offer. Therefore, the money that I'm putting into the purchase represents my portion of the purchase."

Her assertion was, "[I]f I'm putting money in this property, I'm on the deed but not the loan, make it happen." Given the written purchase offer, her understanding was that she

---

[2] In his deposition, the loan officer confirmed that one party may be on the loan while that party and another, who is not on the loan, may be on title to the property.

"would be on the deed and not the loan." Plaintiff recognized that her brother did not agree, and their conversations did not "resolve[ ] anything."

In the transaction, Dana Lee had taken the initiative to coordinate for the buyers in working with the real estate agent, Huhn, with the loan officer, Kirkevold, and directly with the seller. Kirkevold explained that he "mainly" took direction "the whole time" from Dana Lee because he was the "main point of contact" and, although plaintiff was to be on title, she was not on the loan. In his deposition, Huhn explained that he thought of Dana and Tammie Lee as his clients, not plaintiff.

To make the initial purchase offer, plaintiff used savings and borrowed against her Tennessee property to send $130,000 to Dana Lee. To achieve a final sale agreement, plaintiff sent an additional $39,000 to him. Dana Lee received the final portion of plaintiff's money on August 5, 2016.

On the same morning, Dana Lee contacted Kirkevold to report that he had received the money and to instruct that plaintiff and Danielle Lee should be removed from the expected title. In turn, Kirkevold contacted Huhn to direct an addendum to the purchase agreement to remove plaintiff and Danielle Lee, because Dana Lee "wanted it like" that.[3]

Plaintiff was aware that Danielle Lee was "coming in and out of the picture because she was needed *** and then out because she wasn't going to live in Oregon." On August 5, 2016, Huhn sent plaintiff an Addendum No. 10 that removed Danielle Lee as a purchaser. His cover email, created through DocuSign, identified that the addendum would extend the closing date and "remove Danielle." Danielle's removal was not disputed, and plaintiff signed and returned the change.

Huhn then sent a revised Addendum No. 10 that would have the effect of also removing plaintiff as a buyer of the property. Huhn's email said that Addendum No. 10

_____

[3] Kirkevold explained that the lender was involved in the transaction, because it needs to know what is going on, and it gave such directions as a service to the client.

"needed to be revised," but, unlike the prior email that had mentioned removing Danielle Lee, the cover-email did not identify the addendum as removing plaintiff from the transaction.[4] The revised Addendum No. 10 removed Danielle Lee and plaintiff Neel as purchasers and directed that plaintiff "be removed from the title and deed."

Plaintiff recounts that she received the second email and revised Addendum No. 10 at about 10:00 p.m. after she had gone to bed. She received the contract document in DocuSign form, which prompted her to initial or sign at the indicated place, skipping the intermediate text. Her personal computer was not functional, so she received the document "over [her] tiny little iPhone." Plaintiff declared that she mistakenly signed the addendum without realizing its importance. She assumed that she had neglected to execute Addendum No. 10 properly, so she "simply turned to the signature block and entered [her] initials using [her] cell phone screen, in the dark, without putting on [her] glasses."

Plaintiff asserts that her brother Dana Lee, Kirkevold, and Kuhn did not inform her that the revised addendum would have any effect on her rights. She testified:

> "[N]obody said we're taking your name off because you're not on the property. Nobody ever said you shouldn't be on the purchase offer because you won't be on the [deed][.]"

She stressed, "I trusted my brother." She added:

> "I assumed that my brother would work it out with me, that it was—there were something I didn't know or some factor, that I wasn't—I put total faith in him."

She declared that, if she had been told that the change would remove her from the sale agreement and the deed to the property, she would not have signed it.

---

[4] Without explaining the difference, the cover email stated:

> "I can't wait for both of you to see the property in the flesh. I wanted to let you know that I sent out two versions of the 'Addendum #10'. The first one, which you signed, needed to be revised. So the second one is the correct one. The second version should be in your email inbox, Danielle. I apologize for sending two of 'em. Let me know if you have any questions. You two (and the other two!) have done so much work to make this happen! You have been amazing!"

In the course of the transaction, plaintiff signed a document entitled "Verification of Gifted Funds," referring to $169,000 and reciting, "I certify that the above referenced funds are being given as a gift and no repayment is required." The document originated with the lender. Kirkevold, the loan officer, explained:

> "We don't accept loans for down payments from family members; only gifts that don't [*sic*] require to be paid back. It's just part of the conventional guidelines."

In her deposition, plaintiff testified that she understood she had to sign the document so that the lender would provide defendants a loan. In her declaration, she explained that the gift statement was true in that she did not expect repayment of the money. She also declared that her intent had been to leave her estate after her death, including interest in the property, to Dana Lee or his heirs.[5] Even so, she testified that her understanding was that she would be "part owner of the compound." She explained:

> "I was on the purchase offer. So I relied on my name being on the purchase offer meaning that I would also be on the deed. That was common. I mean, why would your name be—from my point of view, why would your name be on the purchase offer if it wasn't also going to be on the deed? Why would I make a purchase and not complete it through being on the deed?"

She summarized, "That money was used to buy a property that I was going to live in for the rest of my life."

The sale closed on August 11, 2016. In November, plaintiff moved to Oregon and, for a time, lived on the property with defendants. After disagreements, plaintiff moved off the property and learned that she had not been a buyer in the transaction and that her name was not on the deed.

B.  *Proceedings*

Plaintiff brought this action asserting two claims. In a claim for financial abuse of a vulnerable person, she

---

[5] Plaintiff also emailed her younger brother, Rick Lee, describing the $169,000 as a gift with no expectation that it would be "fully returned."

alleged that she had been a buyer on a sale agreement that included instructions that a deed would be prepared to include her; that she relied on plans to combine her cash contribution to the purchase; that defendant Dana Lee instructed the loan officer, who then instructed the real estate agent, to remove her from the transaction and deed; that they did so without notice to her; and that defendants' conduct constituted abuse of a vulnerable person contrary to the Elderly Persons and Persons with Disabilities Abuse Prevention Act, ORS 124.100 to 124.140. She sought damages or a constructive trust for amounts traceable to her contribution to the purchase of the property. In the alternative, plaintiff asserted a claim for rescission of her transaction and restitution on the basis of unjust enrichment corresponding to her contribution and added damages.

Defendants moved for summary judgment dismissing the claims. They argued that there was no evidence that they took money or property from plaintiff wrongfully; that defendant Dana Lee never agreed that plaintiff would be on the deed; that plaintiff made a "gift" for which she did not expect to be repaid; and that Dana Lee removed her name from the transaction because that was her wish.[6] They argued that a restitution claim failed because there was no written contract between the parties to be rescinded and because plaintiff's money was a gift.

The trial court responded on the first claim that it found no evidence that defendants had taken money or property by means of deceit or misrepresentation. The court next found no evidence to support the restitution claim, initially because there was no written contract and, after inviting a motion to reconsider, because there was no misrepresentation that "induced" or caused a transfer or loss of property. The court entered an order of summary judgment for defendants, denied plaintiff's motion for reconsideration, and entered judgment dismissing plaintiff's claims.

---

[6] They argued that plaintiff really did not want to be on the deed out of fear of repercussions to her employment, because Dana and Tammie's son (not a defendant) was a medical marijuana grower. She denied that was true.

## II. ELDER FINANCIAL ABUSE

### A. *Framing the Claim*

On appeal, plaintiff contends that the trial court erred in determining that there was no evidence from which a jury could determine that defendants took money or property wrongfully. She argues that defendants knew that plaintiff was on the sale agreement as a buyer, they knew that she was providing $169,000 toward the purchase price with the intent that her name would appear on the deed, and that, after receipt of her money, without notice to her and without her knowledge, Dana Lee took the initiative unilaterally to cause her to be removed from the transaction and title to the property. She contends that her electronic signature on the revised Addendum No. 10 was a mistake— the last part of a set of circumstances constituting elder financial abuse under ORS 124.110(1)(a).

Defendants respond as before. In relevant part, they argue that Dana Lee had said that plaintiff could not be on the title without being on the mortgage debt, that he made no misrepresentation, that plaintiff signed revised Addendum No. 10 that removed her from the transaction, that plaintiff signed a bank document indicating that her money was a gift, and that, as a matter of law, defendants did not take anything wrongfully. Therefore, they conclude, the trial court did not err in dismissing the elder abuse claim without trial.

We approach the dispute by reviewing the elements of a statutory claim of financial abuse of a vulnerable person. At the relevant time, plaintiff Neel was a "vulnerable person" because she was an "elderly person" within the meaning of ORS 124.100.[7] Plaintiff was age 68 at the time of the transaction. In part, ORS 124.100(2) provides:

> "A vulnerable person who suffers injury, damage or death by reason of physical abuse or financial abuse may bring an action against any person who has caused the physical or financial abuse or who has permitted another person to engage in physical or financial abuse."

---

[7] A "vulnerable person" includes an elderly person, ORS 124.100(1)(e), and an "elderly person" means a person 65 years of age or older, ORS 124.100(1)(a).

More particularly, ORS 124.110(1) specifies:

> "An action may be brought under ORS 124.100 for financial abuse in the following circumstances:
>
> "(a)   When a person wrongfully takes or appropriates money or property of a vulnerable person, without regard to whether the person taking or appropriating the money or property has a fiduciary relationship with the vulnerable person."

Several terms of the statute become pivotal. In *Church v. Woods*, 190 Or App 112, 117, 77 P3d 150 (2003) we addressed those terms. We summarized the claim, stating:

> "A statutory claim for financial abuse has four elements: there must be (1) a taking or appropriation (2) of money or property (3) that belongs to an elderly or incapacitated person, and (4) the taking must be wrongful."

We recognized that the term "take" has its ordinary meaning: "'to transfer into one's own keeping [or to] enter into or arrange for possession, ownership, or use of'" money or property. *Id.* (quoting *Webster's Third New Int'l Dictionary* 2330 (unabridged ed 1993)). The trial court had held that there was no "taking" or "appropriation" when the grandniece of an incapacitated Elden Church prompted him to execute a deed to property granting her co-ownership with a right of survivorship. We determined, however, that the transfer diminished his interest in the property so as to constitute a "taking" within the meaning of the statute. *Id.*

Next, we observed that the term "wrongful" had an ordinary meaning and a well-understood legal meaning in the law of torts, as illustrated in the tort of interference with contractual interests. *Id.* at 118 (citing *Empire Fire & Marine Ins. v. Fremont Indemnity*, 90 Or App 56, 62, 750 P2d 78 (1988)). In that context, conduct could be "wrongful" by reason of improper means or improper motives. *Id.* Improper means may be wrongful by reason of statutory or common law and includes, for example, violence, threats, intimidation, deceit, misrepresentation, bribery, unfounded litigation, defamation and disparaging falsehood. *Id.* We considered those examples of "wrongfulness" to be sensible in the context of ORS 124.110(1)(a).

The grandniece argued that Elden Church did not trust the plaintiff, his guardian and later personal representative, and that she, the grandniece, was only carrying out Elden Church's wishes. The plaintiff argued, much to the contrary, that Elden Church did not want the grandniece to have his property when he died. The plaintiff pointed to the haste and secrecy with which the grandniece had acted in facilitating the transfers. We identified a credibility contest over the intent of Elden Church, reversed dismissal of the elder abuse claim, and remanded for the trial court to address the factual issue of wrongfulness. *Id.* at 119.

This case, like *Church*, begins with a question whether there was at least some evidence of a "taking" of money or "appropriation" of property. The answer to that question is complicated by another question—whether plaintiff made an unrestricted gift of money—or instead made a transfer—a purported gift—that was conditioned on a contract expectancy to be in title to the property with defendants. Finally, we face the question whether there was some evidence that defendants' conduct could be found to be "wrongful" in one way or another in taking plaintiff's money or a property interest in the transaction. We address those issues in turn.

B.  *Taking or Appropriation?*

Setting aside for the moment the question of a gift, we recognize that plaintiff did offer evidence, in at least one way, of a "taking," as explained by *Church*. Given the plain meaning of the word "take," there was evidence that defendants did "enter into or arrange for possession, ownership, or use" of $169,000 elicited from plaintiff. It is undisputed that plaintiff transferred to defendants $169,000.

There was also evidence that defendants "appropriated" plaintiff's "property," which existed in the form of a contract to purchase a home, when Dana Lee unilaterally took the initiative to direct that plaintiff's name be removed from the purchase agreement and title to the property. To understand those terms, "appropriate" and "property," we refer to their definition in similar statutes. At ORS 164.005(1), the Criminal Code provides that "appropriate" means to

"[e]xercise control over property of another * * * permanently or for so extended a period or under such circumstances as to acquire the major portion of the economic value or benefit of such property" or "dispose of the property of another for the benefit of oneself or a third person." *See State v. Browning*, 282 Or App 1, 5-6, 386 P3d 192 (2016), *rev den*, 361 or 311 (2017) (comparing terms of criminal mistreatment and elder abuse statute as related or similar statutes). The Criminal Code also defines "property" so as to include the intangible property at issue here. It provides:

> "'Property' means any article, substance or thing of value, including, but not limited to, money, tangible and *intangible personal property*, real property, choses-in-action, *evidence* of debt or *of contract*."

ORS 164.005(5) (emphases added).

At the time plaintiff transferred her money to defendants, plaintiff still appeared on both the agency agreements and the purchase agreement as a "buyer" along with defendants. By its terms, the purchase agreement meant that plaintiff had a contract expectancy in the purchase of the property, which would lead to becoming a joint owner in title to the property. The law recognizes a contract expectancy as property no less than any other tangible or intangible property. *See, e.g.*, *Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 655, 891 P2d 639 (1995) ("Uptown's complaint can be read to allege, further, that Bank told WRC that a loan would be forthcoming if WRC were to remove Uptown as its joint venturer and that Bank's purpose in telling that to WRC was to injure Uptown's economic relations with WRC.").

On that evidence, the admitted act of Dana Lee in unilaterally initiating the removal of plaintiff from the purchase agreement was no less a "taking" or an "appropriation" of property than the act of the grandniece in *Church* causing herself to be added as co-owner with a survivor interest in the property of a vulnerable person. *See Church*, 190 Or App at 117. There, the act of the grandniece diminished the great uncle's interest in property. Here, the act of Dana Lee completely eliminated plaintiff's contract interest in the purchase agreement and deed to the property.

As a consequence, we determine that plaintiff offered at least some evidence of a taking or appropriation of both the "money" *and* "the property" of a vulnerable person.

## C.   *A Simple Gift or Conditioned Transfer?*

Defendants admit receiving plaintiff's money but argue that plaintiff "gave those funds freely" as a gift without condition or restriction.[8] Logically, a jury could find that persuasive evidence of a gift, freely given, could rebut an allegation of a taking.[9] *Cf. Church*, 190 Or App at 117 (considering defendant's contention that the vulnerable person had capacity to give her his property interest offered to rebut wrongfulness). Defendants rely on the "Verification of Gifted Funds," which plaintiff signed, certifying that the "funds are being given as a gift and no repayment is required." Defendants also rely on an email that plaintiff sent another brother in which she wrote, "I am currently giving in excess of $169K with no expectation that it will be fully returned." She continued, "I give it gladly because it has shown me a very happy Dana and family." The trial court found that evidence dispositive when concluding that there simply was no "taking" for purposes of the claim of financial abuse.

We recognize, on the other hand, that there was evidence less conclusive or contrary. The gift acknowledgement was a bank form provided to plaintiff by Dana Lee, who coordinated the transaction. Plaintiff explained that the "gift" statement was true insofar as she did not expect repayment of the money. The loan officer's explanation can be understood to say that the bank does not accept down payments from family members that need to be paid back. Presumably, that meant that added loans would have

---

[8] As for initiating a change in plaintiff's property interest, defendants assert that they understood that plaintiff did *not want* to appear on title to the property, among other reasons, because their plan included growing medical marijuana on the property. As noted, plaintiff testified that that statement of her intent was not true. On appeal, defendants do not argue that their understanding was beyond factual dispute, given the summary judgment standard.

[9] The parties assume that the gift issue is relevant to both elements, "taking" and "wrongfulness." Without deciding, we treat the gift question that way, because the parties have done so and a distinction in approach, if any, is immaterial in this case.

affected the borrowers' creditworthiness. That did not necessarily mean that there could not be other purchasers on the property who provided necessary cash for the purchase with expectation of ownership and no expectation of repayment. The loan officer testified that one person could be on the mortgage loan, while another person could be on the title to the property.[10]

It is undisputed that plaintiff was a "buyer" along with defendants on the purchase contract that instructed her name was to be on the deed. Plaintiff discussed with her brother Dana Lee buying property together to live in a "family compound." Her intent was to be "an owner of the State Street property," appearing on its title, because that was what "the money was for." Although plaintiff recognized that Dana Lee believed that the bank required plaintiff to be on the mortgage debt in order to be on the title, plaintiff insisted that, if she was putting money into the property, then she must be on the deed. Taken together, plaintiff offered evidence that her money, regardless how it may be characterized, *did* come with the condition that it was an integral part of a written purchase agreement on which she already appeared as "buyer" and would appear in title as an owner. Plaintiff offered some evidence that her money was not "freely" given. There was some evidence that, whether deemed a "gift" or not, her money came with one or more significant restrictions that the money be used for the property purchase, that plaintiff would be a participant in an agreement for a joint living arrangement, that plaintiff would be in title to the property, or all of those things.

As a consequence, we recognize that plaintiff provided at least some evidence that created a genuine issue of material fact about the nature of plaintiff's transfer to defendants of $169,000. Generally, the principles that determine whether a transaction is a "gift" do not turn on use of the word "gift" but instead involve an examination of the circumstances of the transaction. Ordinarily, the party who would establish the existence of a gift would bear the

---

[10] Plaintiff stresses that, for a time, defendant Danielle Lee, the adult daughter, was on the contract to be in title without being on the mortgage debt.

burden of proof. *See Ireland v. Flanagan*, 51 Or App 837, 842, 627 P2d 496 (1981) (citing *Carpenter v. Carpenter*, 153 Or 584, 601-02, 58 P2d 507 (1936)); *see also* OEC 305 ("A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim for relief or defense the party is asserting.").[11] We have described the proof required:

> "[A]n *inter vivos* gift transfers the interest in the subject property *unconditionally*, at the time of delivery of the gift. \*\*\* It requires delivery, *a donative intent*, a present vesting of *unlimited rights in the gift* in the donee, and acceptance."

*Bessett v. Huson*, 179 Or App 69, 74-75, 39 P3d 220 (2002) (citing *Kesterson v. Cronan*, 105 Or App 551, 554, 806 P2d 134, *rev den*, 311 Or 426 (1991)) (emphases added). In this case, the evidence raises factual questions about plaintiff's donative intent and whether the transfer was unconditional, leaving defendants with unlimited rights to the money.

In a different setting—that of marital property divisions—we routinely observe that, like credibility, the determination whether something is a gift is a matter reserved to the factfinder. *See Schwindt and Schwindt*, 290 Or App 357, 368, 414 P3d 859, *rev den*, 363 Or 119 (2018) (evidence sufficient to support factfinder's rejection of gift characterization despite gift tax returns); *Schlitter and Schlitter*, 188 Or App 277, 285, 71 P3d 154 (2003) (loan versus gift). It follows that defendants' "gift defense" presents questions for a factfinder about plaintiff's donative intent and whether the transfer was unconditional, leaving defendants with unlimited rights to use her money as they wish.

Those questions may not necessarily be resolved with a conclusion that the transfer was entirely gift or

---

[11] Indeed, we have stated, "The general rule is, rather, that a party seeking to establish the existence of a gift must prove its existence by clear and convincing evidence." *Ireland*, 51 Or App at 842. Here, we are not asked to consider that standard of proof. Nor are we asked whether "gift" is an affirmative defense to "taking" in a claim of elder financial abuse. *See* ORCP 19 B (matters of avoidance are affirmative defenses). Here, on review of summary judgment for defendants, our determination simply turns on a genuine issue of material fact. *See* ORCP 47 C.

not-gift. Reflecting the reality of a human affairs, the *Restatement (Second) of Contracts* recognizes that, outside of commercial transactions, transactions among people may involve both contract and gift. *Restatement (Second) of Contracts* § 71 comment c (1981).[12] The *Restatement* offers an illustration in which one person offers to buy another's book for $10, while both know its value is only $5. The transaction is both bargain and gift. *Id.*, illus. 6. To recognize that a transaction may be both part gift and part contract may accord with plaintiff's expressed intent to be at least in formal title to the property, whatever else that might mean as to what interest she retains. The prospect of a transfer that is part gift and part bargain may accord with plaintiff's email to her other brother that her giving $169,000 had no expectation "that it will be *fully* returned." (Emphasis added.) Thus, a fact question remains even if some aspect of plaintiff's transfer *is* found to be gift.

        In addition, the answer to the "gift" questions may not be simple, because the answer may require a consideration of the living arrangement that the parties planned to achieve with that transfer. All parties described a plan that plaintiff would provide a large sum of money for the down payment, making the purchase possible, and the result would be what Dana Lee had termed a "family compound" in which they lived together, taking advantage of its separate buildings. In his deposition, Dana Lee agreed that the thought was that plaintiff would contribute money toward the acquisition of the family compound and, in exchange for that, there would be a place for her to live and to have a support system at least up to the point where she needed more care. The evidence permits a jury to find that the parties contemplated a substantial financial interrelationship in a common home.

---

[12]  In a comment on consideration, *Restatement* § 71 comment c advises:

   "*c. Mixture of bargain and gift.* In most commercial bargains there is a rough equivalence between the value promised and the value received as consideration. But the social functions of bargains include the provision of opportunity for free individual action and exercise of judgment and the fixing of values by private action, either generally or for purposes of the particular transaction. *** Even where both parties know that a transaction is in part a bargain and in part a gift, the element of bargain may nevertheless furnish consideration for the entire transaction."

In other cases, we have described similar relationships as domestic partnerships. For example, in *Ireland*, two women contributed to the purchase of a home, intending both to be in title, but they learned at closing that only the defendant's name was on the contract. 51 Or App at 839. Some evidence indicated that the plaintiff may have acquiesced to allow the defendant to have a tax shelter. Whatever the explanation, only the defendant appeared in title. The trial court found that the intent of the parties was "similar to the relationship of husband and wife" but that the contributions of the plaintiff were a gift.

On appeal, we rejected the "gift" characterization, because it had not been pleaded or argued. *Id.* at 842. We found that the parties intended a joint ownership of the house, and we reversed the judgment with directions for a division of pooled assets as a domestic partnership. *Id.* at 843-44; *see also Branam and Beaver*, 225 Or App 630, 202 P3d 886 (2009) (domestic partnership where respondent insisted being on title and parties had not contemplated what would happen if they separated); *cf. Unterkircher v. Unterkircher*, 183 Or 583, 591-92, 195 P2d 178 (1948) (where one pays for property but takes title in the name of another, there arises a resulting trust in favor of one whose money paid for it).

As to the "gift" questions here, a jury could find from the evidence, including the purchase contract showing plaintiff as a "buyer," that plaintiff intended a transfer of $169,000 for a down payment that would result in her co-ownership shown in title to the property. A jury could also find that plaintiff intended that, regardless of the state of title, the money would result in tacit co-ownership or a right of occupancy in the premises more or less akin to a domestic partnership.[13] In either case, those determinations could influence the jury's determination whether plaintiff's transfer of money was truly an unqualified gift of money or, because the transfer was restricted or conditioned, plaintiff's transfer of money was not a gift. In other words, defendants'

---

[13] The parties lived together for a period of time. Plaintiff alleged that she "was told that she was not welcome and that she must move off the Property." Defendants argue that plaintiff left willingly for other personal reasons.

evidence did not establish, as a matter of law, that, by reason of gift, there was no taking or appropriation of plaintiff's money or property interest.

D.   *Wrongful?*

Plaintiff alleged that defendants wrongfully took her money when, knowing that she was shown as purchaser of the property and expected to be placed in title and when, without notice to her, they initiated a change that caused her to be removed from the purchase contract and title to the property. Plaintiff argues that a jury could find that defendants' conduct, half-truths, omissions, and misrepresentations were wrongful when taking the money and property for themselves and leaving plaintiff without a place to live.

Defendants respond that there was no evidence that they made a misrepresentation upon which plaintiff relied. They argue that there was no evidence that they were "secretive" in causing plaintiff to be removed from the purchase transaction, because they had told plaintiff beforehand that they believed the lender required her to be on the mortgage debt in order to be in title. Accepting some of that view, the trial court found that there was no evidence that a taking was accomplished by means of deceit or misrepresentation.

As noted at the outset, ORS 124.110(1)(a) renders someone liable for "wrongfully" taking or appropriating the money or property of a vulnerable person. In *Church*, we observed that the term "wrongful" has a familiar legal meaning in torts, as is illustrated by the tort of interference with contractual relations, where "wrongful" involves wrongful means or motives. 190 Or App at 118. Among others, wrongful means include misrepresentation. *Id.*

In tort law, a misrepresentation can be based on either an affirmative misrepresentation or, in some circumstances, active concealment or nondisclosure. *Ogan v. Ellison*, 297 Or 25, 34, 682 P2d 760 (1984); *Gregory v. Novak*, 121 Or App 651, 655, 855 P2d 1142 (1993). Silence or concealment of facts may constitute misrepresentation, particularly when there is a duty to speak. *Pollock v. D. R. Horton, Inc. - Portland*, 190 Or App 1, 20-21, 77 P3d 1120 (2003) (citing

*Whitlatch v. Bertagnolli*, 45 Or App 985, 989, 609 P2d 902 (1980)). Typically, a duty to speak or disclose exists when there is a special relationship between the plaintiff and the defendant. *Gardner v. First Escrow Corp.*, 72 Or App 715, 720, 696 P2d 1172, *rev den*, 299 Or 314 (1985).

That need not always be the case where unique circumstances impose a relationship of trust. We found such a relationship in *Felonenko v. Siomka*, 55 Or App 331, 335, 637 P2d 1338 (1981), *aff'd*, 294 Or 136, 653 P2d 1263 (1982), where the plaintiff uncle and the defendant niece were both from Ukraine, she was a recipient of his deed, and he relied on her to translate. The plaintiff had said that he needed to fix his will, but a friend told him how she had handled a similar problem with a deed. The plaintiff and the defendant went to an escrow company, where the plaintiff executed a deed to the defendant niece, reserving a life estate to himself. Later, he sued to rescind the transaction, claiming a misrepresentation in her failure to disclose that the deed was not a will. *Id.* at 334. In relevant part, we explained that the circumstances imposed a duty of disclosure:

> "Here, plaintiff relied on defendant to translate those parts of the escrow officers' conversations which he did not understand. That reliance, together with the fact that defendant was to be the grantee in the deed, created a confidential relationship between plaintiff and defendant. Because of that relationship, defendant had a duty to explain those aspects of the transaction that she had reason to believe plaintiff did not understand."

*Id.* at 335. We concluded, however, that the plaintiff had actual knowledge that he was signing a deed, because escrow officers had explained it to him, and because he read and understood the word "deed." *Id.*

In *Caldwell v. Pop's Homes, Inc.*, 54 Or App 104, 109-11, 634 P2d 471 (1981), circumstances imposed a duty to disclose. The defendant's nondisclosure was a violation of the provision of the Unlawful Trade Practices Act, ORS 646.608(1), which prohibited representations that goods have qualities that they lack. The plaintiff had purchased a mobile home on site, and the consignment-sales agent had failed to disclose that the mobile home park was being sold,

requiring eventual removal of the mobile home. There had been no fiduciary or special relationship.

>        The sense of those cases may be reflected in the latter portion of section 551 of the *Restatement (Second) of Torts* (1977), which provides:

> "(1)   One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the non-existence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

> "(2)   One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

> "(a)   matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

> "(b)   matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

> "\* \* \* \* \*

> "(e)   *facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them,* the customs of the trade or *other objective circumstances, would reasonably expect a disclosure of those facts.*"

(Emphases added). The final language of section 551 is appropriate in light of the final language of ORS 124.110 (1)(a). Under that statute, a person may be liable for financial abuse

> "[w]hen a person wrongfully takes or appropriates money or property of a vulnerable person, *without regard to whether the person* taking or appropriating the money or property *has a fiduciary relationship with the vulnerable person.*"

(Emphases added.) The emphasized language declares that wrongful conduct is not limited to those with a fiduciary relationship. Although that language would not impose a duty of disclosure where it does not exist in fact, that language *does*

make important the review of the facts themselves that do impose a duty of disclosure.

Here, defendant Dana Lee took the initiative to serve as the coordinator on behalf of the several purchasers of the property, communicating with the loan officer Kirkevold, the real estate agent Huhn, and directly with the seller. Kirkevold confirmed that he "mainly" took direction "the whole time" from Dana Lee. Huhn considered Dana and Tammie Lee his clients, not plaintiff. Huhn disregarded plaintiff, despite the agency agreement showing plaintiff as a client and buyer, who had an equal right to give directions involving her interest. Dana Lee was local; plaintiff was largely away in Tennessee. She relied on him, saying, "I trusted my brother." As the buyers' coordinator and recipient of plaintiff's money, a jury could find that Dana Lee had assumed a role and undertaken a duty to disclose material changes that would disadvantage plaintiff in the transaction that, at the time, still reflected her contractual right to purchase the property and come into title. *See Felonenko*, 55 Or App at 335 (circumstances imposing duty to disclose); *Caldwell*, 54 Or App at 110-11 (same). The jury could also find that defendants, immediately upon receipt of the last portion of plaintiff's money, initiated a contract change, that they knew was contrary to her wishes, to remove her from the transaction and title and that they did so without any consultation or actual notice to her, thus making more likely her alleged mistake in executing a revised electronic document.[14]

As a result, a jury could find on those facts, which are construed here in the light most favorable to plaintiff, that defendants acted wrongfully.[15] Accordingly, the trial

---

[14] In evaluating that alleged mistake, the jury could consider the haste and hour of the *revised* Addendum 10 and the failure of the cover email that accompanied it to call out removal of plaintiff like the original Addendum 10 had called out the removal of Danielle Lee. *See Church*, 190 Or App at 118-19 (consideration of haste in circumstances).

[15] Earlier, we recognized the potential that facts could be found to show an "appropriation" of plaintiff's property interest in the purchase contract. We did so because plaintiff complains about the unauthorized initiation of a change in the purchase agreement. We do not go on to address the prospect that an appropriation of that property interest could be "wrongful" due simply to conversion, *see Becker v. Pacific Forest Industries, Inc.*, 229 Or App 112, 116, 211 P3d 284

court erred in granting summary judgment for defendants on plaintiff's claim of financial abuse of a vulnerable person under ORS 124.110(1)(a).

## III.   UNJUST ENRICHMENT

As her second assignment of error, plaintiff contends that the trial court erred in dismissing her alternate claim for unjust enrichment on defendants' motion for summary judgment and plaintiff's motion for reconsideration. Our review of that assignment is governed by the way in which the claim was pleaded and argued below and on appeal.

In her complaint, plaintiff alleged that the parties planned to jointly buy property to live together; that in those discussions plaintiff made known that her name would be on the property together with defendants'; and that her name appeared on the agency and sale agreements as "buyer." In her second claim, plaintiff added that, if the court determined that the parties "did not have a 'meeting of the minds' and no enforceable agreement between them was established," then the court should find that defendants have been unjustly enriched. Plaintiff alleged that the "transaction should be rescinded, and the Court should award her restitution" in the amount of $169,000 and damages of $17,250. Apparently referring to the plan for a joint living arrangement, she titled her claim one of "Rescission: Restitution."

Defendants moved for summary judgment to dismiss the claim because, among other arguments, there was no written contract between the buyers to be rescinded, and because there should be no liability for a gift voluntarily given. At the hearing on the motion, the court indicated it would grant the motion on the claim, as it later explained, because "a claim for [r]escission necessarily required a 'contract'." However, the court invited a motion for reconsideration, in light of plaintiff's suggestion that she had authority to offer.

Plaintiff moved for reconsideration, citing cases with failed contracts, *Hlookoff v. Wayne L. Johnson Investments*,

---

(2009) (factors of conversion), because conversion has not been presented below or argued on appeal as a matter of wrongfulness.

257 Or 305, 478 P2d 628 (1970), and *L. Q. Development v. Mallory*, 98 Or App 121, 778 P2d 972 (1989), and a more recent case reviewing unjust enrichment, *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or 115, 404 P3d 912 (2017). Plaintiff argued that, if the court found there was no "meeting of minds" and "*neither party was at fault*," then defendants have been unjustly enriched. (Emphasis in original.)

On reconsideration, the trial court deemed plaintiff's cases with failed contracts to be inapt, because the parties had no written contract between themselves to rescind. As for plaintiff's reference to *Larisa's Home Care, LLC*, the trial court noted that plaintiff did not identify, in terms of that decision, which one of many scenarios for unjust enrichment might provide a basis for a claim of unjust enrichment. *See* 362 Or at 128 (citing *Restatement (Third) of Restitution* §§ 5-48 (2011)). On its own initiative, the trial court addressed the scenario involving restitution for a "transfer induced by fraud or material misrepresentation." *See Restatement* § 13 (where, due to misrepresentation, the transferee is liable in restitution as necessary to avoid unjust enrichment). Emphasizing causation, the trial court concluded that plaintiff had offered no evidence that any misrepresentation "*induced* the transfer" of plaintiff's money. (Emphasis in original.)

On appeal, plaintiff does not challenge the trial court's ruling that there was no evidence that any misrepresentation caused the transfer. On the second claim, plaintiff contends, "There is no need to prove fraud." Because plaintiff does not raise that prospect on appeal, we do not consider misrepresentation as a justification for unjust enrichment. *See Summerfield v. OLCC*, 294 Or App 415, 419, 431 P3d 424 (2018) (issue abandoned on appeal), *aff'd*, 366 Or 763, 472 P3d 231 (2020); *see also Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380-81, 823 P2d 956 (1991) (issue not raised in opening brief).

On appeal, plaintiff relies instead on *Hlookoff* and *L. Q. Development* as authority for her alternative claim of restitution or unjust enrichment in situations in which parties acted in reliance on their belief that they had a contract

that, ultimately, they did not have.[16] Those cases do point to a rationale that could support a restitution claim on these facts. The first case is of minimal but elemental assistance; the second more helpful, pointing to a prior version of the *Restatement of Restitution*.

In *Hlookoff*, the plaintiff held a buyer's interest in a sale contract on a motel. 257 Or at 306. The plaintiff agreed to sell that interest to the defendant. *Id.* at 309-10. Although they entered into a written contract, they were mistaken as to how prior liens were to be paid and by whom. *Id.* at 310. The plaintiff refused to transfer the property, then sued to rescind the agreement. *Id.* at 308. The trial court determined that the evidence provided no basis to find fraud or negligent misrepresentation and determined that "[t]here was no meeting of the minds in any sense, no agreement in intention." *Id.* at 309. Absent essential agreement, the trial court rescinded the transaction. *Id.* On appeal, the court determined that the parties were mistaken in their expression of assent to the contract, neither party was at fault, and rescission was warranted. *Id.* at 309-10.

In *L. Q. Development*, the plaintiff's assignors were purchasers of 50 acres for $250,000. 98 Or App at 123. The sale contract provided that the parties would enter into contract addenda upon payments of $25,000 and receive parcel deeds of five acres. The purchasers made payments of $248,814 in principal, interest, and taxes, but no contract addenda were executed and no parcel deeds were delivered. *Id.* The purchasers' assignor sued the personal representative of the seller's estate, seeking rescission of the contract and return of moneys paid. *Id.* at 124. The trial court determined that, due to the failure to have agreed, no contract existed between the parties; judgment for restitution was entered. *Id.* at 124-25. On appeal, we determined:

---

[16] On appeal, plaintiff also argues that unjust enrichment is warranted due to a transfer induced by an invalidating mistake, *Restatement (Third) of Restitution* § 5 (2011), or other particular matters of mistake in a contract, *McKay v. Horseshoe Lake Hop Harv.*, 260 Or 612, 613-14, 491 P2d 1180 (1971); *Stirewalt v. Chilcott*, 236 Or 128, 134, 387 P2d 351 (1963), which do not appear to be of the nature of the cases cited to the trial court. As such, those arguments were not preserved. *See Ailes*, 312 Or 381 (waiver argument not made in trial court was not preserved).

> "The court did not err when it ordered defendant to make restitution. Even though the parties may not have made an enforceable contract, if one of them has been unjustly enriched at the other's expense, the former has a 'quasi-contractual' duty to make restitution."

*Id.* at 125. We explained, "'There are many cases in which a plaintiff is entitled to restitution even though no contract whatever has been made ***.'" *Id.* (quoting 5 *Corbin on Contracts*, § 1104 (1964) (emphasis in *L. Q. Development* omitted)). We recounted that the purchasers and the plaintiff had made payments that the parties believed were required, but, due to a failure to agree on essential terms, the contract was "null and void." *Id.* at 126. We turned to *Restatement of Restitution*:

> "'A person is entitled to recover money which he has paid another pursuant to the terms of a supposed contract with or offer from the other which, because of the payor's mistake of fact as to the existence of consent, of consideration or of a required formality, he erroneously believed to exist, if he does not get the expected exchange.'"

*L. Q. Development*, 98 Or App at 126 (quoting *Restatement of Restitution* § 15 (1937)). Citing a later section of the *Restatement*, we indicated that the amount that the plaintiff should receive is the amount of money the other had received. *Id.* (citing *Restatement of Restitution* § 150)).

As noted, plaintiff also cited the recent opinion of the Oregon Supreme Court in *Larisa's Home Care*. The opinion directed that "courts should determine whether any particular enrichment is unjust by examining whether the case type matches already recognized forms of unjust enrichment." 362 Or at 128. Reflecting back to *Hlookoff* and *L. Q. Development*, we recognize that they are a "case type" that provide restitution for unjust enrichment where supposed contracts fail for lack of essential agreement.

To be sure, the reference in *L. Q. Development* to the original *Restatement* section 15 is dated. Today, that section, which was entitled "Mistaken Belief in Existence of Contract with Payee," is carried forward in other, contemporary sections of the current *Restatement*. *See Restatement (Third) of Restitution*, Parallel Table (2011) (cross-referencing original

section 15 with current sections 6 and 34). For example, one contemporary section advises, in relevant part:

> "Payment of money resulting from a mistake as to the existence or extent of the payor's obligation to an intended recipient gives the payor a claim in restitution against the recipient to the extent the payment was not due."

*Restatement (Third) of Restitution* § 6(2) (Discussion Draft, 2000). Another section now advises, in relevant part:

> "A person who renders performance under a contract that is subject to avoidance by reason of mistake or supervening change of circumstances has a claim in restitution to recover the performance or its value, as necessary to prevent unjust enrichment."

*Restatement (Third) of Restitution* § 34(1) (2011). Those provisions may fairly be considered, given plaintiff's reliance on *L. Q. Development* and its reliance on the *Restatement.*[17] Taken together, plaintiff's citations, their references, and the principles involved do point to a cognizable claim of restitution for unjust enrichment.

Construed in the light most favorable to plaintiff as the nonmoving party, a jury could find from the evidence that the parties had an unwritten and attempted agreement to pool resources to purchase property jointly for purposes of living together in a family compound.[18] It was a plan that may resemble, in some ways, an agreement for a

---

[17] One other *Restatement* section warrants mention, given the allegations of plaintiff's complaint about a plan for a joint living arrangement. *Restatement (Third) of Restitution* section 28 (2011) advises:

> "(1) If two persons have formerly lived together in a relationship resembling marriage, and if one of them owns a specific asset to which the other has made substantial, uncompensated contributions in the form of property or services, the person making such contributions has a claim in restitution against the owner as necessary to prevent unjust enrichment upon the dissolution of the relationship.
>
> "(2) The role of subsection (1) may be displaced, modified, or supplemented by local domestic relations law."

[18] Although defendants argue that an unwritten agreement would violate the statute of frauds, citing ORS 41.580 (agreement relating to an interest in property), plaintiff's part performance, by providing $169,000 of the property's purchase price makes the defense ineffective. *See Brice v. Hrdlicka*, 227 Or App 460, 465-66, 206 P3d 265 (2009) (co-tenant satisfied part-performance exception to statute of frauds).

domestic partnership. *See Ireland*, 51 Or App 837 (domestic partnership). As in *L. Q. Development* and *Hlookoff*, the parties failed to achieve a contract, because they ultimately failed to agree whether plaintiff would be a purchaser who would be in title or would hold a less formal interest in the property in some form of common living arrangement. As such, the record would permit a determination that the parties' agreement to pool resources failed for lack of essential agreement. Further, because the evidence would permit a finding that that agreement failed, the record could support a conclusion that plaintiff was entitled to restitution to the extent that a jury finds that defendants were unjustly enriched.

## IV.   CONCLUSION

The trial court erred in dismissing plaintiff's claim for financial abuse of a vulnerable person and her claim for restitution due to unjust enrichment. Each claim asserts a legal basis for recovery, presents disputed questions of fact, and cannot be resolved as a matter of law on summary judgment. The claims require a jury's determination.

Reversed and remanded.